We'll hear argument first this morning in Case 10-1042, Freeman v. Quicken Loans. Mr. Russell. Mr. Chief Justice, and may it please the Court. For decades, the agency Congress charged with administering the Real Estate Settlement Procedures Act has construed that statute as prohibiting a lender from accepting a charge for a real estate settlement service it didn't provide, whether it accepts that charge directly from a consumer or indirectly through another service provider, and whether it shares that fee with another provider or keeps it all for itself. That interpretation is eminently reasonable and is entitled to deference. And in fact the agency in charge, am I right in thinking that HUD and its successor, they don't have any suit commencement authority? HUD does have authority to bring suits for injunctive relief for violations of 2607B, and if that answers your question. For injunctive relief. For injunctive relief, that's correct. And that agency has long construed the language of this provision as reaching all unearned fees whether divided or not. And that interpretation of language we think is eminently reasonable. I didn't understand you. You said it too fast. It's reaching all something fees whether provided? All unearned fees whether they're split or not. And perhaps this is just maybe a side issue, but I don't see how this is a fee for service. I mean, I thought points is simply a way of paying more money up front and getting a lower interest rate later. It isn't supposed to be for any service. It's simply a question of a loan term, how much you borrow, what the interest rate is. Well, you're right. I do think it's a side issue because the courts below didn't decide that in the quick process. Now, what are we supposed to do? Decide theoretically in the context of a case that does not involve paying a fee for a service that doesn't exist whether you can pay for a service that doesn't exist. I think you can take it on the same assumption that the court of appeals did, that the fee was unearned and decided the question presented. But to answer your question, Congress amended the statute specifically to overrule the Sixth Circuit's decision in Graham, which held that loan discount fees were not covered by the statute in that case involving a kickback. I know Quicken argues that that case involved origination fees. We don't think that's correct. But this is an issue you could have an entire case about. Now, but what's the argument on the other side? The point is a way of paying more money, i.e., borrowing less. Since you pay more, that means you borrow less, and so your interest rate is lower because you've borrowed less. Now, what's the argument on the other side? The argument is Congress specifically defined the term real estate settlement service to include the origination of the loan, which includes but is not limited to the funding of the loan. And it did that in order to encompass kickbacks, at the very least, involving loan discount points, which is what is at issue in Graham. Now, you can have debates, and we will have in this case eventually, debates about what does it mean for a loan discount fee to be unearned. But for present purposes, the circuit split arose here in the much more common circumstance when there are unearned fees for appraisals and courier fees, and that's what the lower court decided on the basis of. And it did so. Scalia I suppose if the lower court could have been wrong for either one of two reasons, we don't have to decide which of the two we're precluded from considering. Right? Phillips No, I don't think you're precluded from considering. I mean, it would be just as well to say that the question presented here decides the case as it would be to say that the question raised by Justice Breyer decides the case, right? And is there any reason to put the one before the other? Phillips There are several reasons. One is the lower courts did not address this question. Quicken hasn't briefed it to any extent. Quicken doesn't ask you to decide it on the basis of that question. We haven't briefed it. It's a complicated question that involves interpretation of another provision of the statute that Congress amended to deal specifically with this problem. And it wouldn't solve the circuit conflict that the court granted to decide. And so if I could turn to that, if you look at the language of the statute, which is reproduced on page 6A of the blue brief, in the words of the statute, a lender who charges an honored fee accepts, within the meaning of the statute, a portion, split, or percentage, i.e., 100 percent, of a charge that was made for the rendering of a covered real estate settlement service, other than for services actually performed. Roberts, your argument that percentage can include 100 percent is certainly true as a matter of logic. But in the phrase portion, split, or percentage, I think the more natural reading of percentage is something less than 100 percent. In other words, you're apportioning or you're splitting the fee with somebody else. You could have portion, I suppose, could still mean a full portion. Split, probably not. But I mean, the more natural reading is surely a division. Well, I think portion is the word that best fits the situation. And Congress has used the phrase portion in other State and other statutes to prohibit, for example, a public official from converting to personal use any portion of the funds entrusted to him. It could mean that, but it need not mean that. It could mean either that or just part and not whole. And which of the two it means is often decided by the other words with which it's associated. I mean, if you have a phrase that says, you know, tax nails and, what, tax nails and wooden pegs, it's clear that nails doesn't mean toenails. It means a fastener. And so also here, when it says portion, split, or percentage, it seems to me the natural reading is that portion or percentage means not, as it could mean, the whole, but rather just a portion. Well, I would say two things about that. One is that when you have a statute that forbids somebody from taking any portion of something, I think the ordinary understanding is that it prohibits them from taking the whole of the thing. The embezzlement statutes are an example of that. Scalia, we have a statute that says you shall not take any portion or split. Right. Okay. And so the canon, though, I don't think is a canon that says when you have related words, you give them all the same meaning. They certainly have something in common. They're all the measure of something. But the canon doesn't say that you read them to all mean the same measure of something, which would run headlong, I think, into the canon against construing statutes that have surplus. One reason — one objection to your idea that, well, this covers partial, so it must cover 100 percent, is that it's a very different issue if you're talking about partial and 100 percent. If you're talking about partial, you have a classic case of a kickback. But if you suddenly say 100 percent of an unearned fee, that's a much more difficult question to decide. In this case, for example, you get a whole bunch of things from Quicken Loans, including the loan and all this other stuff, and it's kind of hard to single out, well, this part is unearned, but this part is earned. It's kind of a whole package. When you have a portion or split, it's an entirely different issue. Well, you still have to decide when you're talking about a kickback whether the person who received the kickback has done anything to earn their portion of it. And so I don't think you avoid the question of what does it mean for a fee to be unearned. Roberts Yeah, but there's a more net – it's a narrower issue when you're talking about a portion. If, say, the kickback goes to the appraiser, maybe you can decide in that case whether the loan company really had anything to do with the appraisal at all. When the alleged unearned fee goes to the whole loan company, it's a little harder to say which part was unearned and which parts might have been earned. It's just that it's the way these loans work, right? I mean, it's the same thing whether you pay 10 percent and no points or 9 percent and 3 points. You know, which one of those is earned or unearned? It's kind of hard to sort it out. It's certainly harder to sort out with respect to loan discount fees. But the run-of-the-mind cases here involve things like appraisals, courier services, flood certifications. Okay, how does that work? The bank says to Mr. Smith, we are going to charge you $100 for a courier service. And then they don't. So there it is on the bill. And Mr. Smith, really knowing he didn't get the courier service, pays the $100. All right, why isn't Mr. Smith guilty on your interpretation? I mean, on your interpretation, every innocent consumer is guilty of a crime. No, that is not the case. Why not? What protects consumers is the last words of this provision, which creates a safe And the critical word here is for. What a consumer is paying for is what she has been charged for. If she has been charged for an appraisal, what she is giving the charge for is for the appraisal. If the appraisal wasn't performed, that shows she didn't get what she paid for. But it doesn't change what she was paying for. So you don't understand that. It's my fault. But wouldn't it says that if she doesn't get the appraisal, but she has to pay for it, then why isn't she why hasn't why doesn't she fall within the statute? I think there are two ways you can construe what it means to pay a charge for. One is what it is you actually got. What you got was nothing. Which was nothing. The other is what you were actually charged for, which was the appraisal. Yes. And I think that latter interpretation is the proper one. I think it's the most natural one. But why isn't the consumer violated? Because she didn't pay for services other than, she didn't pay for services other than services actually performed. And why is the bank liable? Because I think it's different depending on whether you are looking from the perspective of accepting or receiving what the charge is for. So, for example, if you were to go to your mechanic and you were charged for an oil change, but you didn't get one, it would be perfectly natural for you to say, I was charged for and I paid for an oil change. Breyer, this is what you are saying, when the bank writes down, pay $100 for the courier service, the bank is charging for the courier service. Right. When the consumer pays for the courier service, which he sees there, the consumer is not paying for the courier service. He is paying for the nothing. No, I think the consumer is paying a charge for the courier service. All right, then why doesn't he fall within the statute? Because it's not a violation of the statute to pay for a service actually performed. And that's what she's paying for. She's paying for an appraisal. She's not paying for nothing. But the purchaser is the giver. I mean, the statute reads, no person shall give and no person shall accept. The acceptor is the loan company. The person who's giving would be the consumer, the customer. Correct. But so the person who gives is not answerable under your reading of this B. Correct. Because what she is giving the charge for is what she's been charged for. She was charged for an appraisal. She's giving the charge for an appraisal. And that doesn't violate the statute. Scalia, give me an example of where the language give would have an effect. I think in a traditional kickback situation where Quicken, for example, kicked back some of the fee to a real estate agent for nothing, for the referral of the business, which isn't for a service actually performed within the meaning of the statute, that would violate the provision. But then we have Quicken as the giver and the person who receives the referral will kick back as the receiver. That's correct. This provision does double duty. It is designed and written broadly to encompass both traditional kickback situations and unearned fee provisions. Mr. Russell, there's one puzzling aspect of your interpretation. It would be a rather large thing for Congress to say we're going to cover overcharges, as I believe HUD says it counts. And yet in the purposes of the Act, on page 1 of the appendix, it says nothing about overcharges, nothing about payment for a service not received. In the four, it is the purpose of the Act, 2, and then there are four things listed. And none of those say to stop charges for services that weren't performed. That's true. First, just to clarify, we don't we're not arguing that it covers overcharges in the sense of excessive charges. But that is HUD's interpretation.  It's HUD's interpretation about what it means for something to be unearned, not having anything to do with whether split fees are covered or not. But to answer your more specific question, we know that that enumeration is not comprehensive. There are other things in the statute that are not included. And the general purpose of the statute is to cover overcharges. Scalia. But nothing as big as this, if you accept HUD's interpretation of this, which is essentially the issuance of a price schedule by HUD, and anything above these prices is an overcharge and hence falls under this provision. That's immense. It would be immense, but this Court doesn't have to accept that view in order to accept HUD's interpretation. But if we don't, then we reject deference to HUD, which you want us to apply. But as we can't at one time, at one and the same time, give deference to HUD and yet disagree with what HUD says. Certainly you can. And in fact, Your Honor did in Smith v. City of Jackson, where you held that a provision of a regulation recognizing disparate impact was entitled to deference, but a provision saying what you had to prove to show disparate impact or violation wasn't. And here, similarly, in particular, the overcharge part of the interpretation is not even in the regulations. It's in the policy statement. It's a subsequent. Alito. Do you think this is just a labeling statute? Quicken could charge whatever it wanted, bottom line, but if it breaks it down into categories and it doesn't do something that's actually attributable to one of those categories, then there's a violation. I think Congress, yes. I mean, it is — labels are important, because Congress didn't say you simply have to disclose the bottom line. It said you have to give an itemized list. And requiring that those identified line items actually represent services that were actually rendered is a completely reasonable supplement to the disclosure requirement. If I could reserve the remainder of my time. Thank you, Mr. Russell. Ms. O'Connell. Mr. Chief Justice, and may it please the Court. The plain terms of Section 2607b prohibit two separate actions, giving an unearned fee and accepting one. Sometimes the statute will be violated when an unearned fee is collected from the consumer between two service providers, but the statute is also violated when a service provider collects an unearned fee directly from the consumer and retains the entire fee for itself. Breyer, violated in those circumstances because? It's — we agree with the Petitioner's interpretation. Well, can you tell me where in the briefs — I have to read this about six times to get this one in my head. I don't— Where in the briefs does it explain to me why, in your situation, the bank would be violating it, but the consumer wouldn't, since it says no person shall give as well as no person shall receive? Justice Breyer, I don't think this is in the briefs. It's— Well, my goodness, if it isn't in the briefs, it seems — maybe I'm off on a track here, but it seems to me a pretty obvious question. Well, it is— I mean, we have a statute that looks like a kickback statute, and the reason it looks like a kickback statute is it refers both to the person giving and to the person's receiving, and it seems to make them equally liable. You want to apply it to a situation where I don't think you want to hold consumers liable, and so I think you have to explain to me why this statute doesn't on your reading of it. I think the explanation is encompassed in HUD's policy statement. Footnote 6 of the policy statement, which is in the appendix of the Petitioner's brief at 33A, says that HUD would be unlikely to bring an enforcement action against consumers for the payment of external fees. Breyer, you mean it's all prosecutorial discretion? In other words, if you happen to be a consumer, you just have to rely on the good will of the prosecutor. Is that the idea? Justice Breyer, I think it's more than just prosecutorial discretion. What HUD is explaining is that the reason why it would not prosecute a consumer is because the consumer does not make the payment for — does not pay a fee for the payment of unearned fees. Have we said in some of our cases, oh, don't worry, this is within the discretion of the prosecutor, close enough for government work? No, no. Justice Kennedy, I don't think that this is just prosecutorial discretion. This is HUD's interpretation of the statute laid out in a policy statement saying it doesn't think consumers violate the statute because they are — Does HUD have expertise in interpreting criminal statutes? HUD has an expertise in determining what is earned and unearned and what the practices are in the real estate industry for charging consumers fees that haven't been earned by the service providers. What HUD is saying in the policy statement is that the statute is not a criminal statute. Scalia's interpretation of a criminal statute, like ours, must give the defendant the benefit of the doubt, so that if there is any ambiguity, I mean, that's our standard rule, if there is a genuine ambiguity, you find for the interpretation that favors the defendant. And this here, I think this is at the very least ambiguous. And you're telling me, well, I guess you're right. I guess HUD is favoring what would be the defendant in this case? If, yeah, it's saying that it doesn't think that a consumer violates the statute because the consumer doesn't pay the fee other than for services. But can you — I don't want to take all your time on this, because to me the more important problem was the problem of the difference between a kickback statute, which we could understand, as well within HUD's expertise, and normal, and of course a very good reason for doing it, but a price control statute where we have the Federal agency deciding whether the prices are accurate for each service that is rendered or whether some percentage or all of it represents service for nothing. That's a rather big novelty in American life. That is, we have it, but there are usually Federal agencies that have a system set up for determining proper prices and so forth. So it's hard for me to believe that sort of inadvertently Congress brought in the second under the guise of the first without a big fuss being raised and big debate and so forth. Justice Breyer, I think the important point here is that this is not an overcharge case. This is an unearned fee case. Overcharges are included in the 2001 policy statement, but there is a basis in the position that undivided, unearned fees, a fee for which no service is performed, violates section 2607. Kennedy, I'm not sure it seems to me that even under the Respondent's view of the statute, you have to inquire into reasonableness to see if the fee was earned. At some point under anybody's interpretation, there does have to be a determination of whether something was earned, but there is a statutory basis to distinguish between an unearned fee and an overcharge in that the service has to be the fee has to be other than for services actually performed. Wait a minute. If I charge you an exorbitant amount for cutting down a tree, you know, $20,000, and then I present my bill, you would say that I have not earned it simply because it's exorbitant? I don't think you have to evaluate. Under the Respondent's interpretation, I don't think you have to evaluate the reasonableness of the fee in order to decide whether it was earned or not. Under the statute, if it's for the fee is for service, other than for services actually performed, which we think the loan discount fee in this case was a charge other than for a service actually performed, there was no corresponding reduction in the interest rate, that is an unearned fee under anybody's interpretation. It looks to me as though you have an additional statutory problem. You have two sets of verbs in this statute. One is the give and accept set of verbs, and then the other is the charge made or received. So it seems to me that what the statute is thinking about is that, first, that there is a charge, made or received, and that charge is, of course, the charge that the consumer pays to the provider. And then there is another transaction, and that transaction is the give or accept transaction, and that transaction occurs between two service providers. So one set of verbs refers to the consumer-provider relationship. The other set of verbs refers to the provider-provider relationship. Justice Kagan, we agree that that is one scenario covered by 2607b. We don't think it's the only scenario covered by the statute. Under our interpretation and Petitioner's interpretation, there doesn't have to be both a culpable giver and acceptor. So once the charge is received from the consumer and accepted by the service provider, that is also a violation of the statute. It also does cover fees that are split between two service providers, as you say, the giving and accepting, but it doesn't have to involve two service providers under the plain language of the statute. Ginsburg, you are now splitting HUD's position. HUD's position says overcharges are reached by this statute. You say, not overcharges, but only a fee for no services performed. So why couldn't the customer say, there is a fee for the service performed? That's the reasonable fee. And the rest of it is a charge for a service not performed. Can you really maintain that distinction between an overcharge and a fee for services that are not performed? Justice Ginsburg, in this case, we don't think that the Court has to say anything about overcharges and whether those are covered by the statute. The fee in this case was a loan discount fee, which is generally paid to procure a reduction in the interest rate of the loan, and it procured nothing for the Petitioners. It was a completely unearned fee. It was other than for services actually performed. Roberts What does that mean? In other words, the rate that was offered, they said you pay two points and you get a rate of 8 percent, and you are saying that even if they didn't pay the two points, they would still get a rate of 8 percent? Right. My understanding is that when the Petitioners in this case got a quote for their particular interest rate with no mention of points, when it came time to pay the settlement charges, they were charged a loan discount fee, charged points to procure that particular interest rate. That's something that would have to be figured out on remand, whether there actually should have been a charge or whether those points were included in the fee. Scalia I don't know anybody who, any knowledgeable person who applies for a loan who doesn't ask whether there are any points. I mean, it's standard mortgage practice. And somebody who says I'm going to get 8 percent, yes, 8 percent with or without points. I mean, that — I don't think that the mere fact that the interest rate was 8 percent means that you can't charge points and that any charging of points is a charge for a service not performed. The service performed is giving you an 8 percent rate. Now, if she didn't want the points, she should have, when it came time to pay the settlement charges, came to the closing, say, what are these points for? The 8 percent is what you agreed to. And they would have said, well, that 8 percent is the rate we give when we charge two points. O'Connor What RESPA is intended to do is to protect consumers who often are not sophisticated on what they're doing in securing a residential mortgage loan, and to make sure that they understand what the charges are, and also to ensure that they receive the charges for the services for which they pay at closing. Breyer Yes, but that's the problem. The problem is, look, you're saying this is a payment for a service that wasn't given. I think I might say that this is just a lower interest — a higher interest rate than they expected. Somebody might say you didn't get the carrier service at all. Others might say you got service, but not the gold-plated service, and the gold plate was nothing. You see, that's what happens when you get into a price control statute rather than a kickback statute. And that is our concern, I think at least mine. O'Connor Justice Breyer, this case comes here under the assumption that this was an unearned fee. If that's something the Court's concerned about, it's something — it could still decide the question presented, and then the lower courts could figure that out on remand whether this was earned or not. Roberts Thank you, Ms. O'Connor. Mr. Heffernan. Mr. Chief Justice, and may it please the Court. In passing Resp in 1974, Congress was stepping into the middle of a primarily local market controlled by State law. The statute shows that in doing so, Congress tread carefully. It did primarily two things in the area of settlement charges. First, its major reform was to standardize and increase disclosure of charges, including requiring a written estimate of charges to be given to people weeks before the closing. That, in fact, was done here. Second, as Resp's finding and purposes section tells us, Congress found that some consumers needed particular protection from a particular market failure. And I'm quoting from section 2601 in the first page of the blue brief, quote, unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. Congress identified those as kickbacks and referral fees. But in 1974, Congress went no farther. It rejected proposals for direct price regulation, which had been proposed in both House and Senate. Congress did recognize more legislation might be necessary and that price controls might be advisable, and so sent HUD out to do a study and report back. Kagan. Mr. Heffernan, if you are right about subsection B and its meaning, what does it do that subsection A does not do? Heffernan, It does two things. First of all, with respect to the transactions that relate to charges actually paid at the closing, it eliminates the need to prove an agreement. All it says is that there will be a violation if you file the money and the money ends up in the hands. Kagan. Well, if that's the case, I mean, why would Congress have done something that says A, pursuant to an agreement, B, not pursuant to an agreement? Why wouldn't it just have one provision that didn't make any reference to an agreement? Heffernan, Because A covers an entire universe of things which appear in many instances away from the closing table. For example, an agreement between an attorney and a developer that the attorney says I will do all the title work on the raw land for this development if you later on send me the closings when you build on the land and sell the particular parcels. If there was no agreement requirement, agreement for referral, if that did not appear in A, then any relationship between two people in the settlement service business would be presumptively a kickback. And so we have to have that. Scalia. Well, the so-called kickback in A is not for services not actually performed.  There's nothing, what should I say, unethical about getting a fee for a referral. It's called a finder's fee. So, you know, under A, a finder's fee is made unlawful, right? That's correct. Congress has decided that that is not something that should be compensable as part of the real estate business. And under B, something quite different, and that is giving money to somebody who performs no service at all is made unlawful. And for that, you don't need an agreement, right? That's correct. You don't need to prove one. I think all parties view it correctly. So under your reading, as I understand it, the words portion, splitter, percentage means an amount less than the whole. That's correct. So what happens if a service provider gives 100 percent to the other side? As opposed to an amount less than the whole. We don't believe that it is covered by Section 8B. In most of Section 2607B. In most instances, it would probably be provable as a kickback under 2607A, since in normal circumstance, one doesn't give all of the one's fee away unless there's something else going on, typically in this instance a referral. But does that make much sense that you give one meaning, if you stay consistent with your meaning? What you're saying is a situation where the service provider gives away everything 100 percent, they're just not liable under B? If they give away 1 percent, if they keep 1 percent, they're liable? That's correct. Again, Congress was trying to take a measured step here because it was, for the first time, stepping into this local market. Congress left State law remedies alone, and, in fact, the preemption provision  Sotomayor, Judge Higginbottom, in his dissent, said there is a big difference between unearned fees and overcharge fees. He said unearned fees, in their simplest form, is no service whatsoever. Overcharges are some service, but an excessive value. What's wrong with that definition? Why is that definition unworkable in terms of limiting and defining the statute? If the Court would find that portion split of percentage covers 100 percent, then we would agree with Judge Higginbottom that it would – that a liability would not go any further than a situation where the person performed no services whatsoever for them. Scalia is this 100 percent thing a – is this a real problem that Congress was addressing? Do you know of any 100 percent kickbacks? Or 100 percent payments to somebody else for services not performed, as opposed to just keeping part and giving the rest? In fact, isn't that enough reason for it's not being addressed, that it's not a real problem? And, Justice Scalia, there is no indication that we are aware in the legislative history that such a thing was happening. What Congress does is that it's not. Sotomayor, do you think not? How about with subsidiaries? Wasn't it common practice? Isn't it common practice that subsidiaries are often receiving parts of the payment because then they become – they come out of the gross income of the major parent? It's – it is a – it is a common arrangement if those subsidiaries are rendering services in connection with someone's services. So why isn't it a potential common practice that they're getting 100 percent of something they didn't do? Again, there's no indication that they're rendering if they're already rendering services. There's no indication in the legislative history that that type of conduct was going on, and Congress was specifically identifying kickbacks and referral fees, which it referred to, for example, as rebates and commissions, unearned commissions. And the type of conduct which Congress meant to address was set forth in the statute and in the legislative history, and it, of course, deputized HUD to do a study to see if more needed to be done. It recognized that full payments may implicate the issue of rate setting, and that perhaps that's something that should be done, but it wasn't going to be done at this point. Then why is the statute labeled, titled, Prohibition Against Kickbacks, that's one thing, and Unearned Fees? What have you – what does Unearned Fees refer to in the title of 2607? Well, Congress made the decision at the time, as Justice Scalia pointed out, that a fee for a referral is not properly earned. And the definition for the entire section, the title, is Kickbacks and Unearned Fees. That refers to the entire section, A and B. All agree that 2607B frequently is implicated if there is a kickback, so it can't be that the first word applies only to A and the second word only to B. So you think there can be an earned kickback? There could be an earned kickback if Congress was willing to accept the principle that it's okay to earn money for a referral. That's why Congress rejected it, rejected the principle that it's okay to get a – to pay for a kickback. If it's okay to get money for a referral, what type of kickback is not okay? Well, it's – let me be clear. Congress made the policy decision it is not okay to pay a kickback or any money in order to get a pure referral, and therefore said that in section A and section B, it is not proper to do that. It made the decision that a finder's fee in this area, although in all other areas, is perfectly okay, but a finder's fee in this area is a kickback. That's correct. Counsel, if your reading of the language is not plain, if there is two ways to read this statute, give me your best reason for why the policy statement should not be given deference. I know you said because it didn't go through notice and – through notice, but outside of that, why isn't this a HUD interpretation that the statute tells us HUD can do? An interpretation of the statute. We can argue about whether it's an interpretation of Regulation X or not. But why wouldn't it be entitled to deference? It certainly is an interpretation of the statute. We agree with that. And HUD is given the authority, now the Bureau, previously HUD, is given the authority to interpret the statute. In this instance, there's not a – the policy statement should not be due special deference for several reasons. First of all, it's incomplete. It purports to be an interpretation of this statute, and it only touches very briefly and very generally on the language, all the words that we have all spent a lot of time working on in this case. HUD says very little about that. And it is also doesn't – Sotomayor, the Seventh Circuit had said a lot different, and HUD came back and invited HUD to do something, and HUD came back and said, you read it that way, we think this is a better reading. What more do we need from an agency? Because it – it did not treat the subject with the kind of depth that you would expect or that this Court would want. Well, Mr. Heffernan, I don't think that that's true, that – we defer to agencies not because we think that agencies do statutory interpretation in exactly the way courts do. We actually defer to agencies because we think they provide something different, not because they're the best parser of statutory language, but because when we – they see ambiguity, they're able to import policy judgments into that ambiguity. And that seems to me exactly what the agency did here. What the agency did on that point is it simply said that if one construes it the way they would like to construe it, it would address the concern that Congress had for unnecessarily high settlement charges. It provided no empirical or experiential explanation for why that was the case. It didn't say that this type of practice was going on. It didn't say that the interpretation was going to address it. Furthermore, it didn't deal with the fact that its interpretation also is going to sweep in price control and what effect that would be. In other words, the agency did not – did not do the types of things that would cause this Court to defer to it. If there was a case that would address it, it would address it. Scalia, if the agency is construing a criminal statute, a statute providing for criminal penalties, you think the agency is constrained to apply the rule of lenity  interpreted in favor of the defendant? Yes, Your Honor, because the – this is a criminal statute, and it is particularly difficult, it seems to us, to give the policy statement deference, because in order to get to the policy statement, you have to assume the statute is ambiguous and then assume the regulation is ambiguous, and then you get to the policy statement. It would be appropriate for this Court to impress upon the agency to be quite clear and to be quite solicitous of defendants' rights to make sure that it doesn't interpret this statute broader. Breyer, in 1992, they promulgated the regulation, which is the strongest argument, I think, on the other side, it's a strong argument. Has anybody looked at that notice and comment proceeding? Have you looked at it? I absolutely have, Your Honor. All right. If you have, do they go into this point? A point about the point being this is a kickback statute. It isn't an overcharge price regulation statute. Therefore, promulgating a regulation that makes it a crime, a Federal crime, to overcharge, which is what regulation says, is outside the scope of the statute. Now, did someone make that argument? If so, I'd like to be able to read it, and I'd like to be able to see what the agency said in response. Justice Breyer, the regulatory history around this section, which is in Regulation X, is actually quite interesting and quite favorable to the reading the Fifth Circuit gave to the statute. The regulation does appear in 15a and 16a of the blue brief. When it was proposed, there was no discussion whatsoever that suggested that HUD was going to actually legislate or regulate about the statute. It merely, at the time it was proposed, the regulation was going to be to recite section 2607b and that's it. It referred to this section as being a fee-splitting section. When the final rule was issued, there were three additional sentences added in this part of the regulation. There was no explanation for those three sentences, with the exception of HUD's general comment that it made other changes in this part of the regulations in order to address what services. Breyer, you would say? Counsel, I'm sorry. May I just correct you on that? Didn't HUD in that preamble say explicitly the secretary charged by statute with interpreting RESPA interprets 18b to mean that two persons are not required? It says that explicitly. It says that in the policy statement, that's correct. Not in the policy statement, in the preamble to Regulation X. In the? In 1996. I thought that was the final rulemaking you were talking about, because it didn't do rulemaking with respect to the policy statement. That's correct. The 1992 regulation is entitled, no split of charges other than for actual services. And so we read the regulation, and we believe HUD at the time read the regulation as, again, merely repeating the idea that this was, this section was a limited section consistent with Congress's interpretation. It's a fair statement in your view, and we'll hear there's some rebuttal, that in respect to the 1992 regulation, there is a sentence which says a charge by a person for which nominal services are performed is an unearned fee and violates this section. All right? I've elipsed part. All right. Now, it says that. And that later on is taken as being this statute is a, to that extent, a price regulation statute. Is it fair to say that notice of such a regulation was not given? Absolutely correct, Justice Breyer. Notice was not given that that was going to be put into the regulation. And as this Court noted in Long Island Care at Home. Was comment received in respect to that? I don't know whether comment was received or not. There was no indication in the final rule when it discussed comments that that issue was commented upon. What you were about to tell us, what we said at Long Island Home. In Long Island Care at Home, the Court merely repeated in particular statements made in Chevron and Mead that, among other things, a regulation cannot get deference unless it's – if it is procedurally defective. And in this instance, and it talked about the fact that the circumstances sometimes arises when a notice of proposed rule doesn't give the public a notice that there's going to be something happening, so there's no comments given on a particular subject. And in this instance, that's precisely what occurred, which is one reason why Regulation X should not get special deference from this Court. Sotomayor, but I'm not sure. Congress didn't say that HUD could only give interpretations through rules. It said it could give rules, pass rules and regulations, and give interpretations. So what's the procedural defect in it just giving an interpretation? Well, there's not a procedural defect. The issue is really a question of how much deference to give the agency when it gives  Sotomayor, we go back to whether the policy – whether the policy state – whether the statute is ambiguous or not. Correct. As well as if it is, whether one gives Chevron deference. And what I'm trying to figure out is what's the deficiency in the policy statement that's independent of the ambiguity you rely upon? What it is is it is incomplete. It doesn't give an effective statutory analysis. It doesn't really give any effective policy analysis. It's also inaccurate in that it attempts to recount that this is a reading which is of longstanding when we believe, and we cite in the red brief, it's not. Well, it says it's longstanding for it. It attempts to explain why it is a finding, a ruling of longstanding, and we point out examples in the red brief where it isn't a finding, a interpretation of longstanding. Roberts Putting aside the notice and comment point, which I think is at least ambiguous, which of our cases stands for the proposition that whether or not we give Chevron deference depends on the thoroughness with which the agency addressed an issue, rather than simply an announcement of its interpretation? I believe that that was – I believe that that was a factor that the Court looked at in Long Island Care at Home. But the question for the Court in this instance is, should it give this policy statement deference if it doesn't qualify for Chevron deference, then the question is, does it have the power to persuade? Part of the power to persuade is its thoroughness, as Skidmore itself says, the detail in which it addresses things, how it addresses arguments on the other side, and what it says about those arguments. Scalia But you concede that if we give it Chevron deference, you lose? Roberts On the policy statement? Scalia No, on the case. If we give either the policy statement or the rule Chevron deference, you lose. Is that right? Roberts If the Court also then finds that it's deserving of Chevron deference, that's correct. Scalia Ah. You want to talk to that? Roberts Sure. Scalia We don't give deference to interpretations that are beyond the limits of what the language will bear, do we? Roberts That's absolutely correct. And it would be quite an odd result for this Court to find that the policy statement affected some kind of price control, direct rate regulation regime when that was specifically rejected by Congress in 1974. Sotomayor Counsel, I'm a little confused. Under your interpretation or theirs, the Court gets involved in determining whether fees, services were rendered. I mean, it's not as if your interpretation is going to keep the Court out of that business. To be able to find a kickback, the Court has to determine whether services were rendered or not. So what's the difference in that inquiry when it involves a kickback and when it involves a single provider? In a kickback situation, the Court has to decide whether there was actually a service rendered that entitled the person to a percentage or not. Correct? Roberts That's correct. Sotomayor So what's the difference between deciding that question and deciding that the one individual provided a service? Roberts We agree that in each instance the Court would have to make a factual determination. But it comes back to what Congress intended in 1974. It specifically identified that it was attempting to address certain abusive practices that had arisen in some areas. Sotomayor And it listed, as Justice Ginsburg said, unearned fees. Why would it matter to Congress? Give me a reason that it would matter to Congress whether the unearned fee was by one person in a dual relationship or a single person alone. The issue was unearned fees, rendering, charging for a service you didn't render. That's what the whole kickback idea was about, correct? Roberts That's with respect to settlement service providers. Scalia Can you complete your earlier answer? I was just waiting for your point and it never came. Roberts On the question of whether or not to provide Chevron, actually provide Chevron deference if Chevron was applicable. If Chevron is applicable to the policy statement, the policy statement does not deserve Chevron deference, because it is an irrational reading of the statute. The statute does not cover the kinds of direct regulation that the policy statement suggests that it does. Kagan Mr. Heffernan, you might be right that we never get to Chevron deference here, because this statute is plain on its face and there's no ambiguity for the agency to think or do anything about. But let's just assume that there is ambiguity on the statute, and the question is whether to provide this interpretation with Chevron deference. So then, what's your argument for why there should be no Chevron deference to this interpretation, given that the statute under which this interpretation was promulgated refers identically to regulations and interpretations as something that HUD gets to do? The statute does give HUD interpretive authority, but in this instance, what it is doing — in fact, it's not quite clear what words it is interpreting in a way, trying to interpret the words and any vague aspects of the words — is not a gap-filling situation that we're talking about. Congress reasonably, in this statute, as well as in Truth in Lending Act, provided that the agency would have interpretive authority. A lot of what this agency is going to be doing with respect to this statute is filling a lot of gaps. It's going to create the special information booklet. It's going to create these forms that I referred to. Sotomayor Doesn't any agency have interpretive authority regarding the statute it's implementing? That's correct. Is there any agency that doesn't? Certainly, most agencies would think that. Does it have to be specifically conferred? I don't believe it has to be specifically conferred. Is it at all increased when it's specifically conferred? I don't believe the Court's precedent suggests that it's increased if Congress has gone the next step to actually say you have the authority to interpret the statute. The question is, for purposes of deference, is what is the question? The question that HUD sometimes — if HUD is deciding what form should go on the form, then that's interstitial lawmaking, and that's certainly something that might get more deference than if the question is interpreting the legal effect of these words that appear in 2607b. It is not — it's not a definition. They're not purporting to apply a definition. They're not filling a gap. And so this is — this is not where you would look towards a Chevron deference. The Congress is not expecting that HUD would, after it has decided not to allow direct regulation of charges, that HUD would nonetheless try to do it through the back door, through the interpretive authority. Kagan. But that is just a way of saying that there's no ambiguity here. But I was suggesting that if there is ambiguity here, I — at least I have not found a reason not to give HUD deference in this situation. I mean, you say they didn't do a very good job, but we don't usually grade agencies like that and say, well, you didn't do a very good job, so you're not entitled to Chevron deference. The nature of the question that HUD is addressing is interpreting the legal — basically giving a legal interpretation of the statute. It doesn't really purport to give a policy interpretation of the statute, because it simply refers to — it won't pass in the record. Scalia. It gives deference to legal interpretations all the time. But it is a — it is a question of what the Congress intended, whether — whether they intended HUD to be giving the interpretation or filling a gap, or whether it was simply giving guidance. I have no idea why I'm supposed to psychoanalyze Congress in every Chevron case. How to issue the policy statement as a guidance document. Breyer. But that's no, no. That's a good question, and your problem is different people feel differently about the answer. So the — which is why, from my perspective, and perhaps you're only answering a question for me and no one else has it, but I would be pretty interested to know whether, when you looked at the legislative history of this, what you discovered was a lot of complaints about consumers paying for things they didn't get, period, which favors HUD's interpretation, or whether you see a whole long list of complaints about consumers having to pay referral fees where that's just one person taking advantage of another person's business.  And if you've looked at all this, which you could tell me you haven't, I will try to, but what did you find? Your Honor, you actually don't find either. What you find is complaints about providers doing things between each other, and a recognition that ultimately the consumers, perhaps unknowingly, are being harmed by that. The Senate report and the House report both describe that in great detail. We're talking about rebates, commissions, unearned commissions, and kickbacks and referral fees. That's what Congress identified in 2601 as the certain abusive practices that had arisen in some areas of the country. This was not meant to be a panacea. State law remedies stayed in place. And, in fact, if you look at most of the court of appeals cases that give rise to these this circuit split, they all also bring a claim under State law, whether it's fraud or contract or unjust enrichment. That only drives the point home that it's not irrational for Congress to have decided when it was taking a step into this area for the first time to actually legislate an important area, but not go all the way, and instead leave other remedies in place. And that's what the proper reading of this statute should be. That's the reading the Fifth Circuit gave it as well. Ginsburg. Did you give a complete answer to the question, what does B cover that A does not? So what one suggestion is made is when you didn't do all this statute has to do, do with, is kickbacks, then all you need is A, and there's no necessity for B. You said one thing was contract, proving contract, and not anything else? Thank you, Justice Ginsburg. Actually, I didn't give a complete answer, now that I recall. It does cover the best example is the classic reason why the this section was put in in the first place, why it was proposed, and that would be an unearned commission. Title insurance companies at the time would enter into commission agreements with agents, where the agent would get 10 percent of the title premium, and in exchange the agent would do the title work. In a situation if the title agent, in fact, didn't do the title work, it would be receiving an unearned fee, that is, part of the title insurance commission, for no work. And that, however, would not normally be covered under A, because the agreement, the underlying agreement to give the commission was not to refer business, it was actually to do some of the title work. So that situation would be covered. But most situations, as I think all parties agree, this statute is typically a kickback. It just simply removes the agreement requirement. Scalia. And under B, there doesn't have to be an agreement to pay. Under B, there doesn't have to be an agreement to pay the title company for no work. It's just if it's a refinancing and the title company did the same title search, you know, two years ago, it says, heck, I'm not going to do it again, but it still gets the 10 percent, right? That's correct. Even though there's no agreement to pay it for no work. That's correct. So in sum, the elements of the Fifth Circuit's interpretation are all supportive of our view, that is, that the language, the structure, the context and the history of this statute all show that it is important but it's limited, and it does not address a direct charge as made by lenders, and the Fifth Circuit had it right. Sotomayor, I'm sorry. Could you go back to Justice Scalia's question? If a mortgage — if a bank has an appraisal fee from the past and decides, I don't need a new one, but still charges you for an appraisal fee, would that violate the statute? If the — I think the question was in the context of the title agent doing the title work. If an appraiser was charging the consumer directly, not doing the work, it would not violate the statute, again, because the statute requires two provocations. Or if the bank charged you for a title search that it did? If the bank arranged for a title searcher to do title work, and then the bank charged the consumer, and then it split the charge with the title searcher. Sotomayor, so going back to Justice Scalia's question, if the provider decides, I'm going to use what I had before, I'm not going to redo the work, but still charges you a second time, they're not liable under your reading of the statute? Not under 2607b, and perhaps under State law, I assume, for fraud, wouldn't they? I would assume so. That's correct. Thank you, counsel. If no further questions, thank you. Mr. Russell, you have 5 minutes. Thank you. Justice Breyer, you had asked why Congress would engage in a statute that gets at overcharges and is a rate regulation kind of thing, which is very unusual, and I agree it's unusual. That's a reason to read the statute not to do that, to only get at truly unearned fees, which are the equivalent of fraudulent fees, which the law does forbid pervasively. In this case, Congress doesn't. Once you say that, you're outside the reg. I mean, when you read the reg in the policy statement, it's pretty clear what they're thinking of. The policy statement is even clearer. What they're thinking of is overcharges, period. No, I don't think that's correct. I think that there was a two-step analysis. The first step is they decided that split fees are not the only thing that the statute gets out. And then, but the unknown split fee still has to be unearned, and they had a separate interpretation of what it means for a fee to be unearned. Where do you get that in the policy statement, the difference between unearned and? It's towards the end where they enumerate the different kinds of unearned fees. Breyer, it's on 53057, and what they're explaining is that, and they talk about a third situation, and they say one settlement service provider charges a fee to a consumer where no work is done or the fee exceeds the reasonable value of the services performed by that provider. That's correct. And so if it exceeds the reasonable value of the services formed by that provider, you have to say what is the reasonable value of the services performed by that provider. And that involves the agency in the job of deciding what's a fair or just price for this particular service. I'm not disagreeing with you about that. They list four different or three or four different kinds of charges that could be unearned. You don't have to agree with them with respect to each of those things. But what I'm doing there, you see, is now I'm trying to make sense out of an agency interpretation which is other than what it says, where what they're trying to do is to change the nature of the statute from a kickback statute into a statute that protects consumers across the board from paying for things they don't get. Now, that's why I'm sort of interested in what the legislative history said, et cetera, et cetera. It's much more complicated than I thought coming in. I have to look at a lot of things. What Congress said its purpose was, was to get at abusive practices that unnecessarily increase the cost of settlement. What the legislative history was focused on kickbacks, but there were examples in the HUD VA report, at page 16 of that report, and in the Washington Post articles about markups that are a form of undivided unearned fee. Congress knew, subsequent to the passage of the statute, HUD has frequently found and reported to Congress incidents of unearned fees, including those involving loan discount fees. And the States, 21 States, have filed a brief in this case telling you that there is a pervasive problem with settlement closings, including padded charges for things that were never performed. With respect to the agency's interpretation, I would point you particularly to this 1996 rulemaking, where the agency withdrew an exemption for certain payments between consumers and providers for the use of a particular kind of computer service. That exemption would have been unnecessary had HUD thought, as Quicken does, that the statute only regulates transactions between providers. And in withdrawing that exemption, HUD explained in quite a lot of detail that it rejected specifically the split fee requirement. So I don't think there's any question that they've grappled with this question and that they've explained why they think that split fees aren't covered. The question ultimately is whether that's a reasonable conclusion in light of the language of this statute. Breyer, and in part of that is what you might want to say something about the other part. I mean, the purpose of this kind of APA Chevron stuff is to prevent agencies seeing the supreme importance of their own mission, taking a statute, running with it, and in particular transforming into a criminal law, something that really wasn't much there. Now, procedure is important in that. And that's why I'm very interested in whether they gave notice to the public. Dear public, we are thinking that this is far more than a kickback statute. We would like to hear what you think about that. They gave the public more notice than the Court found sufficient in Long Island care at home, which is they told the public this provision is at issue, we're going to issue an interpretation about it, and they ultimately did. In Long Island care, they did the opposite of what they had proposed to do, and this Court said that was enough. In this case, and even in 1996, they received comments with respect to the case law that said that only splits are required, and they said, we disagree. Roberts, and so the case is submitted. Thank you.